Slip Op. 17- 127

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **FRESH GARLIC PRODUCERS ASSOCIATION, CHRISTOPHER RANCH, L.L.C., THE GARLIC COMPANY, VALLEY GARLIC, and VESSEY AND COMPANY, INC.,** | |
| Plaintiffs, | |
| **HEBEI GOLDEN BIRD TRADING CO., LTD., CHENGWU COUNTY YUANXIANG INDUSTRY & COMMERCE CO., LTD., QINGDAO XINTIANFENG FOODS CO., LTD., SHENZHEN BAINONG CO., LTD., YANTAI JINYAN TRADING, INC., JINING YIFA GARLIC PRODUCE CO., LTD., JINAN FARMLADY TRADING CO., LTD., and WEIFANG HONGQIAO INTERNATIONAL LOGISTICS CO., LTD.,** | |
| Consolidated Plaintiffs, | **Before:  Jane A. Restani, Judge** |
| v. | **Consol. Court No. 14-00180** |
| **UNITED STATES,** | |
| Defendant, | |
| **SHENZHEN XINBODA INDUSTRIAL CO., LTD., JINXIANG MERRY VEGETABLE CO., LTD., and CANGSHAN QINGSHUI VEGETABLE FOODS CO., LTD.,** | |
| Defendant-Intervenors. | |

## <u>OPINION</u>

[Commerce's final results of redeterminations in antidumping reviews sustained.]

Dated:  September 19, 2017

Michael J. Coursey, John M. Herrmann, II, and Joshua R. Morey, Kelley Drye & Warren, LLP, of Washington, DC, for plaintiffs.

Robert T. Hume, Hume & Associates, LLC, of Taos, NM, for consolidated plaintiffs Hebei Golden Bird Trading Co., Ltd., Qingdao Xintianfeng Foods Co., Ltd., Shenzhen Bainong Co., Ltd., Yantai Jinyan Trading, Inc., Jining Yifa Garlic Produce Co., Ltd., Jinan Farmlady Trading Co., Ltd., and Weifang Hongqiao International Logistics Co., Ltd.

Yingchao Xiao and Jianquan Wu, Lee & Xiao, of San Marino, CA, for consolidated plaintiff Chengwu County Yuanxiang Industry & Commerce Co., Ltd.

Richard P. Schroeder, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  With him on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director.  Of counsel on the brief was Khalil N. Gharbieh, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

Gregory S. Menegaz, J. Kevin Horgan, and Alexandra H. Salzman, deKieffer & Horgan PLLC, of Washington, DC, for defendant-intervenor Shenzhen Xinboda Industrial Co., Ltd.

John J. Kenkel, deKieffer & Horgan PLLC, of Washington, DC, for defendant-intervenors Jinxiang Merry Vegetable Co., Ltd. and Cangshan Qingshui Vegetable Foods Co., Ltd.

Restani, Judge:  Before the court is the U.S. Department of Commerce ("Commerce")'s

Final Results of Second Redetermination Pursuant to Remand, Consol. Ct. No. 14-00180, ECF

No. 115-1 ("18th AR Second Remand Results") concerning the eighteenth periodic

administrative review ("18th AR") of the antidumping ("AD") duty order on fresh garlic from

the People's Republic of China ("PRC").  See Antidumping Duty Order:  Fresh Garlic from the

People's Republic of China, 59 Fed. Reg. 59,209 (Dep't Commerce Nov. 16, 1994).  Also before

the court is Commerce's Final Results of Redetermination Pursuant to Remand, Ct. No. 15-

00179, ECF No. 74-1 ("19th AR Remand Results") concerning the nineteenth periodic

administrative review ("19th AR") of the same AD order.[1]  For the reasons stated below,

Commerce's <u>18th AR Second Remand Results</u> and <u>19th AR Remand Results</u> are both sustained.

## BACKGROUND

### I.    Eighteenth Administrative Review

In its final results for the 18th AR,[2] Commerce selected the Philippines as the primary

surrogate country for a valuation of the factors of production ("FOPs") to calculate normal value.

<u>See Fresh Garlic From the People's Republic of China:  Final Results and Partial Rescission of</u>

<u>the 18th Antidumping Duty Administrative Review; 2011–2012</u>, 79 Fed. Reg. 36,721 (Dep't

Commerce June 30, 2014) ("<u>18th AR Final Results</u>"); Issues and Decision Memorandum for the

Final Results of Antidumping Duty Administrative Review:  Fresh Garlic from the People's

Republic of China; 2011–2012 Administrative Review at 5, 18th AR PD[3] 361 (June 23, 2014)

("<u>18th AR I&D Memo</u>").  The Philippines' 2011 fresh garlic production, however, comprised

---

[1] Commerce issued its <u>19th AR Remand Results</u> in consolidated court number 15-00179.  That consolidated action was deconsolidated and the issues in the original complaint of that case were consolidated under the instant consolidated court number 14-00180.  <u>See</u> Order, July 12, 2017, Consol. Ct. No. 14-00180, ECF No. 85.

[2] The 18th AR covers the period of review ("POR") from November 1, 2011 through October 31, 2012.  <u>Fresh Garlic From the People's Republic of China:  Preliminary Results and Partial Rescission of the 18th Antidumping Duty Administrative Review; 2011–2012</u>, 78 Fed. Reg. 77,653, 77,653 (Dep't Commerce Dec. 24, 2013) ("<u>Preliminary Results</u>").  Commerce selected Hebei Golden Bird Trading Co., Ltd. ("Golden Bird") and Shenzhen Xinboda Industrial Co., Ltd. ("Xinboda") as the mandatory respondents in the 18th AR.  <u>Id.</u>

[3] "18th AR PD" refers to the original public record index for consolidated court number 14-00180.  <u>See</u> Public Record Index, Consol. Ct. No. 14-00180, ECF No. 24-3.  "18th AR Remand II PD" will refer to the second remand public record index for consolidated court number 14-00180."  <u>See</u> Exhibit Remand Administrative Record Index, Consol. Ct. No. 14-00180, ECF No. 116-1.  And "19th AR PD" refers to the public record index for court number 15-00179, <u>see</u> Public Record Index, Ct. No. 15-00179, ECF No. 19-1, while "19th AR Remand PD" refers to the remand public record index for court number 15-00179, <u>see</u> Exhibit Public Record Index, Ct. No. 15-00179, ECF No. 75-1.

just 0.04% of the world market, ranking it forty-forth in the world.  <u>See</u> Golden Bird SV Info. at

Ex. 1 at 3, 18th AR PD 111 (June 26, 2013).  As detailed in <u>Fresh Garlic Producers Ass'n v.

United States</u>, 121 F. Supp. 3d 1313, 1338–40 (CIT 2015) ("<u>FGPA I</u>") and <u>Fresh Garlic

Producers Ass'n v. United States</u>, 180 F. Supp. 3d 1233, 1242–45 (CIT 2016) ("<u>FGPA II</u>"), the

court twice rejected Commerce's determination that the Philippines is a "significant producer."[4]

Following the court's second remand in <u>FGPA II</u>, Commerce reopened the administrative

record for parties to propose new surrogate countries and to comment on the existing surrogate

countries, India and Thailand.  Reopening the Record at 1, 18th AR Remand II PD 2 (July 25,

2016).  This decision came after two ex parte calls between Commerce and counsel for the Fresh

Garlic Producers Association ("FGPA"), which calls Commerce noted on the record in short,

written memoranda.  Commerce Ex-Parte Mem., 18th AR Remand II PD 1 (July 22, 2016).  In

response to Commerce reopening the record, FGPA submitted data for a new surrogate country,

Ukraine, and Xinboda updated the surrogate value data for India and Thailand.  FGPA New

Factual Data, 18th AR Remand II PD 3–19 (July 29, 2016); Xinboda Updated Factual Data, 18th

AR Remand II PD 28–30 (Aug. 15, 2016).  Xinboda filed a mandamus petition with the court

attempting to keep the record closed, which petition the court denied.  <u>Fresh Garlic Producers

Ass'n v. United States</u>, 190 F. Supp. 3d 1302, 1306–08 (CIT 2016).  Subsequently, in its <u>18th

AR Second Remand Results</u>, Commerce selected Ukraine as the primary surrogate country,

---

[4] Commerce's surrogate country selection is constrained by 19 U.S.C. § 1677b(c)'s requirement
to use the "best available information" and to choose a country "at a level of economic
development comparable to that of the [nonmarket economy, that is a] . . . <u>significant producer[]
of comparable merchandise</u>."  19 U.S.C. § 1677b(c) (emphasis added).

rejecting Thailand and India.  18th AR Second Remand Results at 31.[5]  Xinboda now challenges Commerce's decision to reopen the record, as well as Commerce's selection of Ukraine as the primary surrogate country.

## II.    Nineteenth Administrative Review

In the final results for the 19th AR, covering the POR from November 1, 2012 through October 31, 2013, the two mandatory respondents, Golden Bird and Jinxiang Hejia Co., Ltd., received total AFA rates of $4.71/kg.  Fresh Garlic From the People's Republic of China:  Final Results and Partial Rescission of the 19th Antidumping Duty Administrative Review; 2012– 2013, 80 Fed. Reg. 34,141, 34,141–42 (Dep't Commerce June 15, 2015) ("19th AR Final Results"); Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review:  Fresh Garlic from the People's Republic of China; 2012–2013 Administrative Review at 12, 19th AR PD 233 (June 5, 2015) ("19th AR I&D Memo").  As discussed in Shenzhen Xinboda Industrial Co., Ltd. v. United States, 180 F. Supp. 3d 1305, 1321 (CIT 2016) ("Shenzhen Xinboda"), because the mandatory respondents received AFA rates and volume data for the mandatory respondents was not available, Commerce did not employ its usual method of averaging the mandatory respondents' rates to determine the dumping margin for non-investigated separate rate companies, which included Xinboda.  See 19 U.S.C. § 1673d(c)(5); 19th AR I&D Memo at 7.  Instead, Commerce calculated the separate rate for the 19th AR by using the separate rate of $1.82/kg from the prior AR, that is, the 18th AR Final

---

[5] Commerce's decision to use Ukraine as the primary surrogate country rather than the Philippines changed Xinboda's dumping margin from $1.82/kilogram ("kg") to $2.19/kg.  See 18th AR Final Results, 79 Fed. Reg. at 36,723; 18th AR Second Remand Results at 19.  Because the other mandatory respondent in the 18th AR, Golden Bird, received an Adverse Facts Available ("AFA") rate, Commerce based the separate rate for the 18th AR entirely on Xinboda's dumping margin.  See 18th AR Final Results, 79 Fed. Reg. at 36,723.

Results.  19th AR I&D Memo at 7; 18th AR Final Results, 79 Fed. Reg. at 36,723.  In Shenzhen

Xinboda, the court remanded Commerce's use of the 18th AR's separate rate to calculate the

19th AR's separate rate because Commerce had calculated the 18th AR's rate using the rejected

Philippines as the primary surrogate country.  See Shenzhen Xinboda, 180 F. Supp. 3d at 1323.

The court instructed that "Commerce shall reconsider the separate rate applied to Xinboda and

the other non-examined companies [in the 19th AR], by either employing a different reasonable

method to calculate the separate rate, such as reopening the record to examine new mandatory

respondents, reopening the record to collect information from which to calculate a reliable

separate rate, or if it results in a non-punitive rate for separate respondents, adjusting the separate

rate assigned based on the results of the remand pursuant to FGPA II."  Id. at 1324.  On remand

in the 19th AR, Commerce chose to continue basing the separate rate on the 18th AR's separate

rate, calculated by Commerce to be $2.19/kg.  See 19th AR Remand Results at 2; 18th AR

Second Remand Results at 19.  Xinboda now challenges Commerce's reliance on the 18th AR's

separate rate to calculate the 19th AR's separate rate.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court upholds

Commerce's final results in an AD review unless it is "unsupported by substantial evidence on

the record, or otherwise not in accordance with law[.]"  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

I.     **Eighteenth Administrative Review**

A.     **Reopening the Record**

In its 18th AR Second Remand Results, Commerce reopened the record for the

submission of new surrogate country data.   18th AR Second Remand Results at 4–5, 20.

Commerce justified this decision by stating that the court had not prohibited Commerce from doing so, and had considered the possibility of an expanded surrogate country record in FGPA I and FGPA II.  Id. at 20.  Commerce also stated that it had given parties sufficient time to submit surrogate country data and comment on other parties' submissions.  Id. at 20–21.

Xinboda continues to argue that Commerce's decision to reopen the 18th AR's record and accept the submission of new surrogate countries to value the FOPs was an abuse of discretion.  Consol. Pl. Shenzhen Xinboda Indus. Co., Ltd. Cmts. in Opp'n to U.S. Dep't of Commerce's Remand Redetermination 5–27, Consol. Ct. No. 14-00180, ECF No. 127 ("Xinboda Cmts."); Consol. Pl. Shenzhen Xinboda Indus. Co., Ltd. Reply Cmts. in Opp'n to U.S. Dep't of Commerce's Remand Redetermination 3–10, Consol. Ct. No. 14-00180, ECF No. 133 ("Xinboda Reply").  Xinboda argues that Commerce's ex parte phone calls with FGPA influenced its decision, and contends that Commerce did not "need" to reopen the record because data for India and Thailand existed on the record.  Xinboda Cmts. at 11, 21–27.  In addition, Xinboda states that reopening the record frustrates the finality of judicial decisions.  Id. at 19–20.  Xinboda also contends that FGPA's filing of data from Ukraine was untimely, and that FGPA did not exhaust its administrative remedies before submitting the information.  Id. at 14.  Lastly, Xinboda argues that allowing Commerce to reopen the record and ultimately calculate a higher dumping margin will have a chilling effect on respondents' willingness to challenge Commerce's dumping determinations because even though a respondent may be successful before the court, it may ultimately receive a higher rate than calculated in the final results.  Id. at 19–20; Xinboda Reply at 8–9.

The government and FGPA respond that Commerce's decision to reopen the record was not arbitrary and capricious.  Both parties contend that the court explicitly mentioned the

possibility of reopening the record in <u>FGPA I</u> and implicitly did so in <u>FGPA II</u>.  Def.'s Resp. to

Cmts. Regarding Second Redetermination 9, Consol. Ct. No. 14-00180, ECF No. 132 ("Gov't

Resp."); Pls.' Resp. to Def.-Intvr.'s Cmts. on Remand Results 3–4, Consol. Ct. No. 14-00180,

ECF No. 131 ("FGPA Resp.").  Next, the government and FGPA argue that Commerce's ex

parte phone conversations are not problematic because Commerce, in line with the applicable

statutes and regulations, made a public record of the conversations.  Gov't Resp. at 9; FGPA

Resp. at 4–5.  The government further states that it is irrelevant whether Commerce "needed" to

reopen the record, given the existence of Thai and Indian data, because Commerce has the

discretion to reopen the record.  Gov't Resp. at 15.  In addition, the government argues that

permitting Commerce to reopen the record does not call into question the finality of Commerce's

dumping determinations because the court has the authority to forbid Commerce from reopening

the record.  <u>Id.</u> at 14–15.  Lastly, the government contends that neither timeliness nor exhaustion

issues precluded FGPA from submitting data on Ukraine because Commerce requested the

additional information from parties, thus creating a new deadline.  <u>Id.</u> at 12–14.

Commerce properly exercised its discretion in deciding to reopen the record.  Reopening

the record on remand is a matter largely left up to Commerce's discretion.  <u>See</u> <u>NTN Bearing</u>

<u>Corp. of Am. v. United States</u>, 25 CIT 118, 124, 132 F. Supp. 2d 1102, 1107 (2001) ("As long as

the Court does not forbid Commerce from considering new information, it remains within

Commerce's discretion to request and evaluate new data."); <u>Laclede Steel Co. v. United States</u>,

19 CIT 1076, 1078 (1995) ("Any decision to expand the administrative record upon remand is

well within [Commerce's] discretion, absent express language from the court barring such

action."); <u>see also</u> <u>Nippon Steel Corp. v. Int'l Trade Comm'n</u>, 345 F.3d 1379, 1382 (Fed. Cir.

2003) ("Whether on remand the Commission reopens the evidentiary record, while clearly within

its authority, is of course solely for the Commission itself to determine.").  There is no reason to

set aside Commerce's decision on the facts here.  As discussed below, the Thai and Indian data

that existed on record prior to Commerce reopening the record suffered from significant flaws.

Indeed, the court stated in FGPA I that "[u]pon remand, Commerce can decide to compile a

second list of potential surrogate countries," and that "Commerce may have to expand its

surrogate country list to include other [market economy] countries."  121 F. Supp. 3d at 1340

n.17, 1342.  The court said nothing to the contrary in FGPA II.  There, the court noted that, in

this case, "the significant producers are not closely economically comparable and the chosen

economically comparable countries may not be significant producers."  FGPA II, 180 F. Supp.

3d at 1244.  Accordingly, the court is not now convinced that reopening the record was beyond

Commerce's discretion.

        None of Xinboda's arguments to the contrary are persuasive.  First, the fact that

Commerce reopened the record shortly after an ex parte phone call, although concerning, is not

enough to invalidate Commerce's decision.  Commerce complied with its statutory duties

regarding ex parte conversations and made a record of the phone calls, detailing that Commerce

discussed with FGPA's counsel "the potentiality of opening the record in this review."  Ex Parte

Phone Call Mem. at 1, 18th AR Remand II PD 1 (July 22, 2016); see 19 U.S.C. § 1677f(a)(3)

(directing Commerce to maintain a record of ex parte meetings).  In addition, Xinboda's finality

concerns fall short because the court has the authority to instruct Commerce not to reopen the

record, thus preventing endless reopening of the record.  See NTN Bearing, 25 CIT at 124, 132

F. Supp. 2d at 1107 (stating that Commerce has the discretion to request new data "[a]s long as

the Court does not forbid Commerce" from doing so).  Furthermore, Xinboda's contention that

FGPA's submission of Ukrainian data was untimely and that FGPA did not exhaust its

administrative remedies fails because Commerce invited the parties to submit surrogate country

data.  Thus, the relevant deadlines were not those governing the submission of data during the

course of an administrative review, but the deadlines set by Commerce when it made the

invitation to submit new surrogate data.  See Elkay Mfg. Co. v. United States, Slip Op. 15-33,

2015 WL 1786940, at *3 (CIT Apr. 20, 2015) (rejecting a similar argument because "[t]he

remand proceeding is being conducted under the authority of this Court pursuant to statutory

provisions governing judicial review, not the provisions governing the time limits for the

agency's conducting of the investigation prior to the publication of the contested

determination.") (internal citations omitted).  FGPA's submission of the Ukrainian data occurred

within these deadlines.  See 19 C.F.R. § 351.301(c)(3)(i) (stating that "[a]ll submissions of

factual information to value factors of production . . . are due no later than 30 days before the

scheduled date of the preliminary determination."); Extending SV Deadline at 1, 18th AR

Remand II PD 20 (Aug. 3, 2016) (Commerce extending the deadline for new surrogate value

information to August 8, 2016); FGPA Remand II SV Submission at 1, 18th AR Remand II PD

3–19 (July 29, 2016) (FGPA submitting new surrogate value data on July 29, 2016); Reopening

the Record at 1, 18th AR Remand II PD 2 (July 25, 2016) (Commerce reopening the record for

parties "to propose new and comment on existing surrogate country candidates and surrogate

values," and setting a deadline of July 29, 2016 by which to do so).

        Although the court recognizes the potentially chilling effect on challenges to Commerce

determinations that Commerce's ability to reopen the record and ultimately calculate a higher

dumping margin may have, this risk should not have been unknown to Xinboda given the court's

statements in FGPA I on the possibility of reopening the record and Commerce's discretion to do

so.  Xinboda cites no authority for the proposition that when Commerce opens the record on

remand it must ultimately choose data favorable to the party who first won before the court.

Thus, the court will not overturn Commerce's decision to reopen the record for surrogate country

selection purposes.

###    B.    Selection of Ukraine

In its 18th AR Second Remand Results, Commerce selected Ukraine as the primary

surrogate country, rather than India or Thailand.  18th AR Second Remand Results at 1.

Commerce concluded that Ukraine is economically comparable to the PRC, a significant

producer of fresh garlic, and that Ukraine offers the highest quality data.  Id. at 7–9, 13–15.  As

for India, Commerce rejected it as a potential surrogate country primarily because it is not

economically comparable to the PRC.  Id. at 7, 23, 30.[6]  Regarding Thailand, Commerce chose

not to use it, first, on the grounds that Thailand was not a significant producer of fresh garlic

during the POR.  Id. at 8–9, 21–24.  Commerce reasoned that the court in FGPA II had stated

that there were only ten significant producers of garlic during the POR, and that because

Thailand was not in the top ten, it was not a significant producer.  Id. at 8, 23.  In addition,

Commerce noted that Ukraine had produced twice as much garlic during the POR.  Id. at 8–9.

Second, Commerce concluded that Thailand's data was of an inferior quality to that of Ukraine.

Id. at 9–15, 24–30.  Commerce found several faults with Thailand's data—Thailand's garlic

bulbs are smaller than those grown in the PRC, Thailand's data was not clearly exclusive of

taxes and duties, Thailand's prices are for the entire garlic plant (including stems and roots), and

one of the four Thai data sets is for harvest months only, a time of the year with high supply and,

accordingly, low prices.  Id. at 11–12, 25–26.  Regarding the Ukrainian data, Commerce rejected

---

[6] In addition, Commerce criticized the Indian data for being from "a single wholesale market" rather than representing country-wide, farmgate prices.  18th AR Second Remand Results at 29–30.

Xinboda's central concern with the Ukrainian data—that Ukrainian prices were aberrantly high

during the POR.  Id. at 13–15.  Commerce reasoned that world market prices in general were

historically high during that period, that Xinboda's comparisons of Ukrainian prices to world

market prices were flawed, that Thai prices were also outside the norm, and that higher

Ukrainian prices likely could be explained by Ukrainian garlic's larger bulb size.  Id. at 13–15,

27–28.

Xinboda argues that Commerce's selection of Ukraine as the primary surrogate country

over Thailand and India is not supported by substantial evidence.  Xinboda Cmts. at 2, 21–32.

First, Xinboda contends that Thailand should have been selected as the primary surrogate

country because, contrary to Commerce's conclusions, Thailand is a significant producer of fresh

garlic and offers data superior to Ukraine's data.  Id. at 26–28.  Xinboda posits that Thailand is a

significant producer because Thailand's production of fresh garlic is above the world mean when

the PRC is excluded, the court's reference to top ten producers in FGPA II was meant merely to

show that there are a variety of significant producers available in this case, and Commerce has

selected a country with less garlic production than Thailand as a surrogate country in subsequent

ARs.  Id. at 21–27.  Xinboda argues that Thailand's data is superior to Ukraine's principally

because Ukraine's prices during the POR were aberrantly high vis-à-vis world market prices.  Id.

at 29.[7]  Second, Xinboda argues that Commerce should alternatively have selected India as the

primary surrogate country over Ukraine because, although India was "less" economically

---

[7] Xinboda also contends that no financial statement from Ukraine exists on the record, that
Thailand has a more specific and contemporaneous labor rate than Ukraine, and notes that only
one of the four Thai data sources was restricted to harvest months, and, regardless, harvest-
period data accurately mirrors the PRC's high supply market.  Xinboda Cmts. at 27–28, 31–32.

comparable to the PRC than other countries, India is clearly a significant producer.  Id. at 23–24.[8]

The government and FGPA respond that Commerce's choice of Ukraine as the primary surrogate country was supported by substantial evidence.  Gov't Resp. at 15–24; FGPA Resp. at 6–9.  The government argues that Commerce correctly concluded that Thailand is not a significant producer because Thailand was not a top ten world producer nor close to being one, and because there is a relatively steep drop-off in production after Ukraine, the tenth largest producer.  Gov't Resp. at 16–20.  In addition, the government and FGPA attack the quality of the Thai data, primarily by stating that it is not specific to the size of garlic bulb under review.  Gov't Resp. at 23; FGPA Resp. at 8.  As for Ukraine, both parties state that Ukraine's relatively high prices can be explained by its large garlic bulb size, and that the lack of a Ukrainian financial statement is irrelevant.  Gov't Resp. at 22–24; FGPA Resp. at 8–9.  Lastly, both parties argue that India is not a suitable surrogate country because India is not economically comparable and its data is not reflective of a country-wide average.  Gov't Resp. at 24; FGPA Resp. at 9.

"[T]he valuation of the [FOPs] shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce]."  19 U.S.C. § 1677b(c)(1)(B).  In determining the best available information, Commerce "shall utilize, to the extent possible, the prices or costs of [FOPs] in one or more market economy countries that are (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise."  Id. § 1677b(c)(4).  To decide between countries that fit these requirements, Commerce typically

---

[8] Xinboda also argues that India's data is more specific than Ukraine's data to the garlic bulb size consumed by the mandatory respondent, Xinboda.  Xinboda Cmts. at 31–32.

looks to the following data considerations:  "(1) public availability, (2) product specificity,

(3) broad market average, (4) tax and duty exclusivity, and (5) contemporaneity of the data."

Fresh Garlic Producers Ass'n v. United States, 83 F. Supp. 3d 1330, 1337 (CIT 2015) ("FGPA

2015").  Furthermore, Commerce is obligated to "establish[ ] antidumping margins as accurately

as possible."  Shakeproof Assembly Components, Div. of Il. Tool Works, Inc. v. United States,

268 F.3d 1376, 1382 (Fed. Cir. 2001).  Accordingly, "Commerce's practice is to reject

'aberrational' data that does not reliably indicate the price a producer would have paid for the

input."  Peer Bearing Co.–Changshan v. United States, 752 F. Supp. 2d 1353, 1370 (CIT 2011).

Substantial evidence supports Commerce's determination that Ukraine offers the best

available information.  No party challenges Commerce's conclusion that Ukraine is both

economically comparable and a significant producer, nor could they.[9]  India, meanwhile, is not

economically comparable, thus using it as a surrogate country "would lead to a severe

understatement of the surrogate values."  18th AR Second Remand Results at 23; FGPA New SV

Data at Ex. 1 at 2–3, 18th AR Remand II PD 3 (July 29, 2016) (showing that India's gross

national income ("GNI") per capita in 2011 was $1,420, while the PRC's was $4,940); Office of

Policy ("OP") GNI Band List at Attach. at 2, 18th  AR PD 78 (Apr. 9, 2013) (listing countries

economically comparable to the PRC with a GNI per capita for 2011 of $2,210 to $7,660).

---

[9] Ukraine produced 171,900 metric tons of fresh garlic in 2011, which placed Ukraine in the top
ten countries for production.  See Golden Bird SV Info at Ex. 1 at 1, 18th AR PD 111 (June 26,
2013).  Excluding the PRC and India, Ukraine's market share of world production is 4.99%, far
more than the Philippines' 0.26%, which was Commerce's previous surrogate country option.
Id. at 2–4; see Xinboda Cmts. at 25.  Regarding economic comparability, Ukraine's gross
national income ("GNI") per capita for 2011 was $3,130, which is within the Office of Policy
("OP")'s GNI band and comparable to the PRC's GNI per capita of $4,940.  Office of Policy
GNI Band List at Attach. at 1–2, 18th AR PD 78 (Apr. 9, 2013) (listing economically
comparable countries with a 2011 GNI per capita range of $2,210 to $7,660); FGPA New SV
Data at Ex. 1 at 2.

Given the existence of data from a country that is both a significant producer of the subject merchandise and economically comparable, Commerce properly rejected India.

The only remaining surrogate country option is Thailand.  Commerce reasonably concluded, however, that Ukraine offers higher quality data than Thailand.[10]  Xinboda's central complaint with the Ukrainian data is that it is aberrantly high vis-à-vis world market prices.  To this end, Xinboda provides a table of 2011 and 2012 fresh garlic prices from "top world producers of garlic," which Xinboda argues is "thus most indicative of global average pricing." Xinboda Cmts. at 29–30; Xinboda Updated Factual Data at Ex. SV-5 at 7, 18th AR Remand II PD 28 (Aug. 15, 2016).  In this table, Ukraine does have the highest price in both years and Thailand a mid-range price.  Xinboda Cmts. at 30; Xinboda Updated Factual Data at Ex. SV-5 at 7.  But, Ukraine's price is not so high in relation to the others as to be unreliable.  The mere fact a surrogate value is the highest on record does not make that value aberrational.  See Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States, 929 F. Supp. 2d 1352, 1356 n.9 (CIT 2013).  As noted by Commerce, the 2012 Ukrainian price in Xinboda's comparison is only 14% higher than the second highest price, and 17% higher than the third highest price.  18th AR Second Remand Results at 28; see Xinboda Updated Factual Data at Ex. SV-5 at 7, 18th AR Remand II PD 28 (Aug. 15, 2016).[11]  Xinboda cites no case law in which the court has found

---

[10] Thailand is also a less significant producer than Ukraine, having produced 75,589 metric tons of fresh garlic in 2011, constituting 2.19% of the world market when the PRC and India are excluded.  Golden Bird SV Info at Ex. 1 at 1–4, 18th AR PD 111 (June 26, 2013).  Because the court concludes that substantial evidence supports Commerce's determination that Ukraine offers higher quality data than Thailand, the court does not decide whether Thailand qualifies as a "significant producer."

[11] Commerce focused solely on the 2012 price, although the POR is November 1, 2011 through October 31, 2012.  See Preliminary Results, 78 Fed. Reg. at 77,653; 18th AR Second Remand Results at 28.  If the countries' average prices are weighted between the two months in 2011 and

(continued…)

such price differentials to be indicative of aberrational prices, and indeed, the court has generally

been concerned only with much larger price differences.  See Xinjiamei Furniture (Zhangzhou)

Co. v. United States, Slip Op. 13–30, 2013 WL 920276, at *1, *7 (CIT Mar. 11, 2013)

(remanding Commerce's selection of a surrogate value that was three times higher than the

others on record); Peer Bearing Co.–Changshan v. United States, 752 F. Supp. 2d 1353, 1369–74

(CIT 2011) (remanding Commerce's choice of a surrogate value four times higher than the

others on record, and remanding a different surrogate value when it was 60% higher than the

rest); Mittal Steel Galati S.A. v. United States, 31 CIT 1121, 1133–35, 502 F. Supp. 2d 1295,

1306–08 (2007) (remanding a surrogate value selection choice that was ten times higher than

those of other countries).[12]  Neither are Xinboda's other concerns with using Ukraine as the

---

ten months in 2012, Ukraine's garlic price is 18% higher than the next highest country (Russia)
and 22% higher than the third highest country (Spain).  See Xinboda Updated Factual Data at Ex.
SV-5 at 7, 18th AR Remand II PD 28 (Aug. 15, 2016).  These percentages also fail to present
cause for concern.

[12] Furthermore, FGPA offered a price comparison of its own, relied on by Commerce, that
indicates Ukraine's price is not extraordinarily high when compared to the world average.
FGPA made two comparisons for this purpose.  First, it analyzed Ukraine's price vis-à-vis the
average price of countries on the OP list, weighted two months for 2011, and ten months for
2012.  FGPA Remand Rebuttal Cmts. at 14, 18th AR Remand II PD 32 (Aug. 25, 2016); 18th
AR Second Remand Results at 14.  In this comparison, Ukraine's price was 22.2% above the
average, while Thailand's price was 49.4% below the average.  FGPA Remand Rebuttal Cmts. at
14; 18th AR Second Remand Results at 14.  Second, FGPA compared Ukraine's price to the
average price of market economy countries within the GNI band.  FGPA Rebuttal Cmts. at 15;
18th AR Second Remand Results at 14.  In this analysis, Ukraine's price was 26.4% above the
average, and Thailand's price was 47.6% below the average.  FGPA Rebuttal Cmts. at 16; 18th
AR Second Remand Results at 14.  Although these comparisons are likely less indicative of
world market trends than Xinboda's table indicating prices for significant producers, they further
support Commerce's conclusion.

primary surrogate country convincing.[13]

The Thai data, meanwhile, suffers from unique flaws that further support Commerce's conclusion that Ukraine's data is superior to that of Thailand.  First, the Ukrainian garlic bulb[14] data provides prices for garlic bulbs that are more analogous in terms of bulb size to those consumed by the PRC respondents than those produced in Thailand.  Record evidence indicates that Thai garlic bulbs are relatively small, whereas Ukrainian and PRC garlic bulbs are both relatively large.[15]  Second, as Commerce determined in the underlying final results of this

---

[13] Xinboda challenges the use of Ukraine as the primary surrogate country because Ukraine has no financial statement on record and Thai labor statistics are more specific and contemporaneous than Ukraine's.  Xinboda Cmts. at 31–32.  Commerce's selection of Ukraine despite these deficiencies was reasonable in this case, however, given that "raw garlic bulb is the most significant input because it accounts for the largest percentage of [Normal Value]."  See Decision Memorandum for the Preliminary Results of the 2011–2012 Antidumping Duty Administrative Review:  Fresh Garlic from the People's Republic of China at 11, 18th AR PD 208 (Dec. 16, 2013) ("Prelim. I&D Memo").  Additionally, as Commerce noted in the 18th AR Second Remand Results, it is unlikely that the financial ratios derived from the financial statements vary greatly between countries of similar economic development.  18th AR Second Remand Results at 29.

[14] As noted, "raw garlic bulb is the most significant input [of fresh garlic] because it accounts for the largest percentage of [normal value]."  See Prelim. I&D Memo at 11.  In addition, the parties do not dispute that the size of garlic bulbs apparently can influence prices.  See, e.g., Fresh Garlic from the People's Republic of China:  Issues and Decision Memorandum for the Final Results of the 13th Antidumping Duty Administrative and New Shipper Reviews and Recission, In Part, the Antidumping Duty Administrative and New Shipper Reviews at 15, A-570-831 (June 8, 2009), available at http://enforcement.trade.gov/frn/summary/prc/E9-14358-1.pdf (stating that the "size of the garlic bulbs is given significant value in the marketplace.").

[15]  For this proposition, the government relies on FGPA's citation to the seventeenth AR, where evidence indicated that "the majority of garlic grown in Ukraine is large (i.e., 50-55 mm) and white, similar to the garlic produced in the PRC."  See Decision Memorandum for the Preliminary Results of the 2010–2011 Antidumping Duty Administrative Review:  Fresh Garlic from the People's Republic of China at 11, A-570-831 (Dec. 3, 2012), available at http://enforcement.trade.gov/frn/summary/prc/2012-29986-1.pdf.  Thai garlic, however, appears to generally be significantly smaller.  See FGPA Cmts. on SV Selection at 6–7, Ex. T-2 at 3, 18th AR PD 116–49 (June 28, 2013) (showing that Thailand's government reports statistics for garlic bulbs generally ranging from 15–35mm).  Xinboda does not challenge that these countries

(continued…)

administrative review and reiterates in the <u>18th AR Second Remand Results,</u> the Thai data is not

clearly exclusive of taxes and duties. <u>See</u> <u>18th AR I&D Memo</u> at 10; <u>18th AR Second Remand</u>

<u>Results</u> at 26. Xinboda does not here challenge that finding. Third, one of the four Thai data

sources only reports values for the harvest months. <u>See</u> Xinboda Updated Factual Data at SV-1

at 1, 18th AR Remand II PD 28 (Aug. 15, 2016); Golden Bird SV Info at Ex. 3 at Attach. 1, 18th

AR PD 239 (Jan. 27, 2014). Commerce reasonably concluded that data from these high supply,

low-price months would be less accurate than a data set reflective of the entire POR, even if the

PRC is also a high supply market. <u>See</u> <u>18th AR Second Remand Results</u> at 12; <u>FGPA 2015,</u> 83

F. Supp. 3d at 1340 (noting Commerce's preference for contemporaneous data). Given these

concerns, and Commerce's reasonable conclusion that the Ukrainian data is not aberrantly high,

Commerce's selection of Ukraine as the primary surrogate country for calculating normal value

in the 18th AR is supported by substantial evidence.

## II.    **Nineteenth Administrative Review**

In its <u>19th AR Remand Results,</u> Commerce chose to continue using the separate rate from

the 18th AR[16] to calculate the dumping margin for the non-examined separate rate companies in

the 19th AR, including Xinboda. <u>See</u> <u>19th AR Remand Results</u> at 26, 40–42. Commerce cited

the court's instruction in <u>Shenzhen Xinboda</u> that Commerce could use the 18th AR rate "if it

---

generally grow these sizes of garlic, but instead argues that the Ukrainian and Thai data report
prices "for all fresh garlic, regardless of size." Xinboda Cmts. at 32. Although this appears true,
Commerce reasonably assumed that prices from those countries will reflect prices for the bulb
sizes generally grown in those countries, even if some other size bulbs are also grown in each
country.

[16] As discussed above, based on its investigation of Xinboda, who was a mandatory respondent
in the 18th AR, Commerce initially calculated the 19th AR separate rate to be $1.82/kg, <u>see</u> <u>18th</u>
<u>AR Final Results,</u> 79 Fed. Reg. at 36,723, and after remand in the 18th AR, determined the rate
to be $2.19/kg, <u>see</u> <u>18th AR Second Remand Results</u> at 19.

results in a non-punitive rate for separate respondents." Id. at 15, 41–42.  In response to

Xinboda's request that Commerce use Ukrainian garlic bulb surrogate data from the 19th POR

rather than the 18th POR, Commerce stated that mixing a surrogate value data set from the 19th

POR with "Xinboda's factors of production and U.S. prices from the 18th POR . . . would not

result in a reliable antidumping duty margin." Id. at 41.

Xinboda argues that Commerce should not have used the 18th AR's rate to set the rate of

the non-examined separate rate companies in the 19th AR.  Pl. Shenzhen Xinboda Indus. Co.,

Ltd.'s Cmts. in Opp'n to Remand Results 1–3, Ct. No. 15-00179, ECF No. 78 ("Xinboda 19th

AR Cmts.").  Xinboda first supports this position by noting that, at the time of Commerce's

decision, the 18th AR's rate was not a final rate.  Id. at 1–2.  Second, Xinboda posits that the

18th AR's rate is punitive because, as argued above by Xinboda, Ukraine's garlic prices in the

18th POR were aberrantly high.  Id. at 2.[17]  Lastly, Xinboda argues that Commerce should have

used 19th POR-contemporaneous Ukranian data to value the garlic bulb input because the bulb is

the most critical surrogate value, Commerce can easily update the bulb price, and doing so

"would make the margin contemporaneous and more representative of garlic prices" for the 19th

POR.  Id. at 2.[18]

---

[17] Because the court today sustains Commerce's calculation of the 18th AR's separate rate, this
argument fails.

[18] Xinboda also argues that Commerce unreasonably failed to select Xinboda as a mandatory or
voluntary respondent.  Xinboda 19th AR Cmts. at 3–5.  As Xinboda acknowledges, and FGPA
and the government point out, the court has already concluded that Commerce properly declined
to investigate Xinboda because of Xinboda's failure to exhaust its administrative remedies.  See
Shenzhen Xinboda, 180 F. Supp. 3d at 1317–20; Xinboda 19th AR Cmts. at 3; Def. Intvrs.'
Resp. to Cmts. on Remand Results 7, Ct. No. 15-00179, ECF No. 84 ("FGPA 19th AR Resp.");
Def.'s Resp. to Cmts. Regarding Remand Redetermination and Mot. to Strike Extra-Record Exs.
32, Ct. No. 15-00179, ECF No. 82 ("Gov't 19th AR Resp.").  Accordingly, the court will not
reconsider this matter.  See Intergraph Corp. v. Intel Corp., 253 F.3d 695, 697 (Fed. Cir. 2001)

(continued…)

The government and FGPA respond that Commerce reasonably chose to base the 19th

AR's separate rate on that of the 18th AR.  The government argues that Commerce need not have

waited for the court to sustain the 18th AR's rate before using it in the 19th AR because the court

explicitly permitted Commerce to use the 18th AR's rate if it was not punitive.  Def.'s Resp. to

Cmts. Regarding Remand Redetermination and Mot. to Strike Extra-Record Exs. at 31, Ct. No.

15-00179, ECF No. 82 ("Gov't 19th AR Resp.").  In addition, the government and FGPA submit

that using a surrogate value that is contemporaneous with neither the FOPs used by Xinboda in

the 18th AR, when it was a mandatory respondent, nor with Xinboda's sales prices from the 18th

AR, would lead to a distorted and unreliable dumping margin.  Def.-Intvr.'s Resp. to Cmts. on

Remand Results at 7–8, Ct. No. 15-00179, ECF No. 84 ("FGPA 19th AR Resp."); Gov't 19th

AR Resp. at 31.

"To determine the dumping margin for non-mandatory respondents in [non-market

economy] cases (that is, to determine the 'separate rates' margin), Commerce normally relies on

the 'all others rate' provision of 19 U.S.C. § 1673d(c)(5)."  Amanda Foods (Vietnam) Ltd. v.

United States, 33 CIT 1407, 1417, 647 F. Supp. 2d 1368, 1379 (2009).  The separate rate under §

1673d(c)(5) is "typically . . . calculated by averaging the rates of the individually examined

exporters."  Albemarle Corp. & Subsidiaries v. United States, 821 F.3d 1345, 1348 (Fed. Cir.

2016).  But, if the individually examined exporters' dumping margins were established based on

facts available, as here, Commerce "may use any reasonable method" to set the separate rate.  19

---

("The doctrine of law of the case generally bars retrial of issues that were previously resolved.").
Xinboda also contends that Commerce should have selected an additional mandatory respondent
in the 19th POR, even if it were not Xinboda.  Xinboda Cmts. at 4–5.  Xinboda did not directly
advance this argument in its initial challenge to the 19th AR Final Results, however, thus
Xinboda waived the argument and the court will not now consider the matter.  See generally Pl.
Shenzhen Xinboda Indus. Co., Ltd. Mem. in Supp. of Mot. for J. on the Agency R., Ct. No. 15-
00179, ECF No. 31.

U.S.C. § 1673d(c)(5); see Amanda Foods, 33 CIT at 1418, 647 F. Supp. 2d at 1379.  As

explained by the authoritative Statement of Administrative Action ("SAA"), "[t]he expected

method in such cases will be to weight-average . . . margins determined pursuant to the facts

available."  Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep.

No. 103-316, vol. 1, at 873 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201; see Albermarle,

821 F.3d at 1352 n.5.  If, however, volume data is unavailable or the method "would not be

reasonably reflective of potential dumping margins for non-investigated exporters," then

Commerce may use "other reasonable methods" to determine the separate rate.  SAA at 4201;

see Albermarle, 821 F.3d at 1352.  Commerce must strive to make the dumping margin as

accurate and as current with the POR as possible.  See Albermarle, 821 F.3d at 1356; Yangzhou

Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1379 (Fed. Cir. 2013).

Commerce's use of the 18th AR's separate rate to calculate the 19th AR's separate rate

was reasonable in this case.  First, Commerce's selection of a rate that was not yet final is not an

unscalable barrier.  As the government and FGPA note, the court explicitly said that Commerce

could use the 18th AR's rate as long as it resulted in a non-punitive rate.  See Shenzhen Xinboda,

180 F. Supp. 3d at 1324.  Although this is a unique case, Xinboda cites to no authority to support

its position here.  The problem is not using a non-final rate,[19] but using a rate that is improperly

calculated, which is why the court remanded Commerce's selection of the 19th AR's rate in

Shenzhen Xinboda.  See id.  Second, Commerce reasonably declined Xinboda's request to insert

the 19th AR's Ukrainian garlic bulb price into its calculation of the 18th AR's separate rate, for

---

[19] Obviously, using a rate from a different proceeding has the potential for creating problems.
This is not optimal, but can be dealt with, as this case demonstrates. This is just one of the
myriad of complications stemming from Commerce's refusal to expand the number of examined
respondents.

purposes of determining the 19th AR's separate rate.  Granted, the 2013 Ukrainian garlic price

put forth by Xinboda is more current with the POR for the 19th AR (November 31, 2012–

October 31, 2013) than the 2011 and 2012 prices used in the 18th AR, and the 2013 price is 38%

lower than the 2012 price.  See Xinboda Draft Remand Comments at Attach. 1, 19th AR

Remand PD 25 (Apr. 25, 2017).  But, using the updated garlic bulb price would not necessarily

result in a more accurate dumping margin.  It is possible that Xinboda's use of the FOPs during

the 19th POR or Xinboda's U.S. sales, neither of which exist on the record in the 19th AR, see

19th AR I&D Memo at 10–11, changed during the 19th POR such that using Xinboda's

preferred method would be less accurate than simply leaving the 18th AR's rate intact.

Furthermore, there is no other record evidence indicating that Xinboda's dumping margin in the

19th AR was lower than in the 18th AR, when Xinboda's rate was individually determined, such

as de minimis rates for the mandatory respondents in the 19th AR.  Accordingly, Commerce

reasonably decided to apply the 18th AR's separate rate of $2.19/kg to the separate rate

companies of the 19th AR.

**CONCLUSION**

For the foregoing reasons, the court sustains Commerce's 18th AR Second Remand

Results and 19th AR Remand Results.  Judgment will enter accordingly.

/S/   Jane A. Restani
Jane A. Restani
Judge

Dated:  September 19, 2017
New York, New York